# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF VIRGINIA
*Alexandria Division*

| | |
|---|---|
| **DHARMESH JAIN**<br>25568 Upper Clubhouse Drive<br>South Riding, Virginia 20152<br><br>   *Plaintiff*,<br><br>   **V.**<br><br>**THE COUNTY BOARD OF ARLINGTON COUNTY, VIRGINIA, THE GOVERNING BODY FOR THE COUNTY**<br>2100 Clarendon Blvd<br>Arlington, Virginia 22201,<br><br>   *Defendants*. | Case No.: 1:19-cv-560 |

## COMPLAINT

**1.**   Plaintiff Dharmesh Jain brings this complaint for monetary and equitable relief, through counsel, against Defendant The County Board of Arlington County, Virginia, the Governing Body for the County (the "County") under the Americans with Disabilities Act, 52 U.S.C. § 12101 to 12213 (the "ADA").

## JURISDICTION & VENUE

**2.**   This Court has jurisdiction over this action pursuant to 42 U.S.C. § 2000e-5(f)(3), made applicable to the ADA by 42 U.S.C. §12117(a).

## PARTIES

3.      Mr. Jain is a resident of South Riding, Virginia who was hired by the County on December 28, 2015. While at the County he worked as the Decision Support Chief in the County's Department of Environmental Services ("DES").

4.      The County Board of Arlington County, Virginia, the Governing Body for the County (the "County" or "Defendant") is the governing body for the County of Arlington, Virginia and Mr. Jain's former employer.

## MR. JAIN'S DISABILITY

5.      Mr. Jain is dealing with difficult, painful, and exhausting medical complications that, put simply, wear on him.

6.      These conditions <u>did not diminish his ability to perform his work for the County.</u>

7.      Mr. Jain suffers from Cardiac and Neuro Sarcoidosis.

8.      Cardiac sarcoidosis is a rare disease in which clusters of white blood cells, called granulomas, form in the tissue of the heart. Any part of the heart can be affected, though these cell clusters most often form in the heart muscle where they can interfere with the heart's electrical system (conduction defects) and cause irregular heartbeats (arrhythmias).

9.      Cardiac sarcoidosis can also result in heart failure. Most people diagnosed with cardiac sarcoidosis also have granulomas in other organs of the body, and so it is with Mr. Jain's condition.

10.     In Mr. Jain's case, his neuro sarcoidosis leads to a chronic "aching leg" that, along with his sarcoidosis generally, substantially limits his ability to work, walk, and his energy levels, generally.

11.     Further, Mr. Jain also has an Implantable Cardioverter Defibrillator.

12.     Mr. Jain also occasionally speaks with a stammer.

13.     Of note, none of these disabilities prevented Mr. Jain from performing the essential functions of his position with the County.

## ADMINISTRATIVE EXHAUSTION

14.     Mr. Jain filed a charge of discrimination with the United States Equal Employment Opportunity Commission on August 23, 2018, alleging disability discrimination, harassment, and retaliation.

15.     On February 7, 2019, the EEOC issued a Dismissal and Notice of Rights to Mr. Jain.

16.     Mr. Jain received his dismissal and Notice of Rights on February 11, 2019.

## FACTS

17.     On December 10, 2015, the County Offered Mr. Jain employment as the Decision Support Chief in the Director's Office within the Department of Environmental Services.

18.     Mr. Jain accepted the offer and started work on December 28, 2018.

19.     Mr. Jain reported to Environmental Services Director Greg Emmanuel.

20.     In his role, Mr. Jain supervised three offices and as many as eighteen to twenty subordinates.

21.     Pursuant to Chapter 5 of the County's Administrative Regulation 2.7 (the "Probationary Period Regulation"), Mr. Jain was placed into a "Probationary Period."

22.     Pursuant to the Probationary Period Regulation, County employees, except certain firefighters and sheriffs, are considered probationary during their first 12 months of employment.

23.     As a probationary employee, Mr. Jain was an at will employee, according to the Probationary Period Regulations.

24.     Importantly, once County employees leave the probationary period, they have access to the County's Grievance Procedures, which allows employees to grieve dismissals that are based upon disciplinary or performance-based concerns.

25.     That ability is unavailable, in large measure, to the County's at will probationary employees.

26.     Early indications were that Mr. Jain's performance with the County was strong.

27.     In fact, Mr. Emmanuel made no complaints, in writing or in person, to Mr. Jain until at least December 14, 2016. But that began to change after Mr. Jain shared the fact of his deteriorating health with Mr. Emmanuel.

28.     On or about August 2, 2018, Mr. Jain disclosed, perhaps for the first time, the fact of his conditions to Mr. Emmanuel, in Mr. Emmanuel's office.

29.     Jain was soon thereafter visiting his physician for ongoing treatment, and he thought it appropriate to share these facts with Mr. Emmanuel, given that absence.

30.     After Jain informed Emmanuel of Jain's disabilities, Emmanuel began to make an increasing number of comments about Jain's "lack of energy," which comment was followed by Emmanuel's complaints about Jain's "lack of leadership presence."

31.     Any "lack of energy" on Jain's part is an expression of his sarcoidosis, as was made clear in medical documentation provided to the County.

32.     Jain's primary care provider, Nurse Practitioner Alice Greenwood, signed

FMLA paperwork for Mr. Jain on October 16, 2017, wherein she stated:

> Current etiology of RLE pain being evaluated. pain impacts patient's ability to walk and stand - also contributes to fatigue due to pain / causes decreased energy level. Please allow time off when requested for pain flares.

33.     On information and belief, Emmanuel's repeated references to Jain's "lack

of energy" and "lack of leadership presence" are naked references to the visible expression

of symptoms of Jain's disabilities. He is in pain, and it can be visible. It apparently made

Emmanuel uncomfortable.

34.     Emmanuel also complained about Jain's occasional issue with stammering.

35.     Jain would refer these complaints to the County's Human Relations staff in

late 2017, when Emmanuel's quest to push Jain out was reaching its conclusion, as will be

discussed later.

36.     Around the end of 2016, Mr. Jain was to receive his first performance ap-

praisal from Mr. Emmanuel.

37.     Pursuant to the County's policies, Mr. Emmanuel appraised Mr. Jain's per-

formance using "Key Work Expectations ("KWE").

38.     In the County's *Guidebook to Performance Management* (the "Management Guidebook") the County describes using a Performance Management Cycle ("PMC") to manage employee performance.

39.     The assignment of KWEs is an important part of the "Performance Planning" part of that process.

40.     Just as important is the *weighting* of KWEs, which informs employees about the *relative importance* of their various KWEs.



*Arlington County's Performance Management Cycle*

41.     In the "Performance Appraisal" portion of the PMC, which occurred for Mr. Jain first at the end of 2016, County supervisors like Mr. Emmanuel are to rate employees like Mr. Jain by rating them against their weighted KWEs using a five-point rating

system, with each number representing an attempt to quantify the employee's success in

meeting their KWEs.

| Has Not Met Expectations | Meets Expectations | Role Model |
|---|---|---|
| Did not effectively meet goals and objectives; goals and objectives were not completed in a timely manner; achieved very few IOS. | Effectively met goals and objectives and completed all goals and objectives on time; achieved all IOS. | In addition to effectively and efficiently meeting all goals and objectives outlined above and achieving all IOS, proactively took on additional key work projects to address shift in organizational priorities; consistently provides the highest quality and timely work products and services to meet internal and external customers' needs. |

| | |
|---|---|
| 5 | Consistently performs as described by "Role Model" standards. |
| 4 | Frequently performs as described by "Role Model" standards and always performs as described by the "Meets Expectations" standards. |
| 3 | Consistently performs as described by the "Meets Expectations" standards. |
| 2 | Sometimes performs as described by the "Meets Expectations" standards and sometimes performs as described by the "Has Not Met Expectations" standards. |
| 1 | Frequently performs as described by the "Has Not Met Expectations" standards. |

*The Five-Point Rating System*

42.     The County then uses software called OnBase to derive a final rating from

the (1) the weighted KWEs and (2) the supervisor's ratings of the employee's performance

related to those KWES.

43.     And the OnBase software *requires* that an employee's total KWE weights

equal 100%, which accords with common sense.

44.     Importantly, the County uses OnBase's appraisal score to make personnel

decisions, like its decisions to extend Jain's probation in December 2016.

45.     According to the management guidebook, appraisals of 3.0 or greater qual-

ify employees for annual pay increases.

46.     Though the Management Guidebook does not specifically reference the County's Administrative Regulation 2.7, it corresponds with the Regulation's Guidance, which limits annual pay increases to those employees that "meet performance standards."

47.     In preparation for his 2016 appraisal, Mr. Jain submitted to Mr. Emmanuel Jain's own accounting of his very successful 2016.

48.     But Mr. Emmanuel's appraisal of Mr. Jain's 2016 performance would prove problematic because Mr. Emmanuel did not comply with County policies.

49.     First, Mr. Emmanuel waited until Mr. Jain's 2016 appraisal, on December 28, 2016, to *inform Mr. Jain about the KWEs* that Mr. Emmanuel had been expecting Jain to meet.

50.     This violates the County's Management Guidebook, which describes the Performance Planning process, where KWE's are established and communicated to the employee, as "critical." According to the County's Management Guidebook, "The Planning Phase of the Performance Management Cycle ultimately provides expectations that guide the employee through the work he or she is expected to perform throughout the year. It helps to ensure both the supervisor and the employee share the same understanding of expectations. It also eases the rating process at the end of the review cycle and helps to make those ratings more accurate."

51.     Additionally, Mr. Emmanuel intentionally, and in violation of the County's appraisal process, reduced the total weight of Mr. Jain's KWEs to 90%.

52.     Put another way, Mr. Emmanuel reduced the weight on some or all KWEs such that, when those respective weights were summed, they totaled 90%, as opposed to 100%.

53.     The effect of that deviation from procedure was to reduce Mr. Jain's fairly-rated appraisal from 3.0 to 2.9.

54.     Mr. Emmanuel did not hide why he had done this: to permit him to extend Mr. Jain's probationary period, thus preventing Jain from acquiring any right to grieve or challenge a decision to dismiss him.

55.     In his meeting with Mr. Jain regarding this appraisal, Emmanuel said, "Dharmesh you don't deserve the low rating of 2.9, but if it is over 2.9 then the HR Director won't allow me to put you on extended probation."

56.     Mr. Jain specifically discussed the reduced-weight KWEs with Mr. Emmanuel and others in the County because *OnBase would not let Mr. Jain sign the appraisal with a reduced KWE weight*.

57.     Emmanuel had to contact some person with the ability to perform some form of override, and then Emmanuel informed Jain that the OnBase system would accept Jain's signature to the reduced-weight appraisal.

58.     So, by Mr. Emmanuel's own admission, Emmanuel modified Jain's 2016 appraisal by impermissibly reducing the weight of Jain's KWEs specifically to reduce Mr. Jain's fair appraisal score from 3.0 to 2.9, thereby depriving Mr. Jain of his opportunity to move, in full accordance with County policy, from probationary, at-will status to a permanent employee with access to the County's grievance process.

59.     But even as Emmanuel attempted to push Jain out through subjective purported performance concerns, see ¶¶ 30, 33, he acknowledged Jain's satisfactory effort, diligence, and performance while complaining to Jain of nebulous and subjective complaints.

60.     For example, in a Memorandum on June 28, 2017 Emmanuel again extended Mr. Jain's probationary period while acknowledging that Jain "diligently pursued and transactionally completed many of the activities requested in December 2016" (when Emmanuel first extended Jain's probationary period).

61.     In that June 28, 2017 memorandum, Emmanuel also claimed that Mr. Jain was the wrong "fit."

62.     Emmanuel's shifting unhappiness with Jain's "fit" and "energy" came to a head beginning in late May, 2017.

63.     On May 24, 2017 Mr. Emmanuel asked Jain to resign with an effective date of resignation on September 29, 2017.

64.    In Emmanuel's office, Jain asked why, and Mr. Emmanuel complained about Mr. Jain's "leadership presence."

65.    Then, on May 30, 2017, Mr. Jain submitted a leave request for a medical procedure, which Mr. Emmanuel neglected to approve.

66.    Emmanuel requested again, on June 6, 2017, that Jain resign effective September 29, 2017.

67.    This time, Jain pressed him, and Emmanuel *admitted* that Mr. Jain's performance, ethics, and integrity were all satisfactory.

68.    On June 12, 2017, Jain approached Emmanuel in Emmanuel's office about his need for upcoming surgery and Emmanuel's neglect of Jain's leave request, referenced in ¶ 65.

69.    And then, on June 16, Emmanuel *again* asked Jain to resign, and Jain pressed him once more.

70.    This time, Emmanuel said, Jain's problem was that some of Jain's subordinates only "followed" him out of, of all things, "respect," and this was somehow problematic.

71.    On October 2, 2017, Emmanuel informed Jain's subordinates, without Jain's approval or resignation, that Jain would be leaving soon.

72.     So on October 23, 2017, Mr. Jain emailed Disability Resource and ADA Co-ordinator Anthonia Sowho, wherein he wrote:

| | |
|---|---|
| **From:** | Dharmesh Jain |
| **Sent:** | Monday, October 23, 2017 1:36 PM |
| **To:** | Anthonia Sowho |
| **Subject:** | FW: Health status |
| **Attachments:** | Scanned Documents.pdf |

*[handwritten: No Jresponce out-z-office response]*

Hi Anthonia,

I want to forward the attached certification to you.  In the last few months I have been told multiple times by my supervisor that I don't show the energy I demonstrated during the hiring process.  Due to my current health situation, it is very difficult to maintain the same level of energy.  However, it doesn't impact my performance.

Please let me know when I can come to your office to discuss my situation and seek your advice.

Thanks,

Dharmesh Jain, Ph.D., GISP
Decision Support Chief, Department of Environmental Services
DES Suite 915
703.228.3508  (P), 571.305.0588 (M), djain@arlingtonva.us

*October 23, 2017 email to Disability Resource Coordinator*

73.     On October 24, as Emmanuel's pressure mounted, Jain filed a grievance, complaining of disability discrimination based on Emmanuel's repeated comments about Jain's "energy," lack of "fit," and "leadership presence."

74.     Emmanuel fired him three days later, on October 27, 2017.

---

## COUNT I
### *Disability Discrimination: the Firing*

75.     Mr. Jain realleges each prior allegation in this Count I.

76.     Mr. Jain was the County's employee, and it his employer, within those respective terms' meanings as defined in 42 U.S.C. §12111.

77.    And Mr. Jain was, at the time of his firing by the County, a qualified individual because he was meeting the County's *legitimate* expectations of his performance.

78.    Emmanuel admitted that, if he had weighted Mr. Jain's KWEs in accordance with County practice and guidelines, Jain would have *automatically* transitioned to being a permanent employee.

79.    And Emmanuel *admitted* when he did so that Mr. Jain did not "deserve" the rating.

80.    This is an admission that Emmanuel's December 2016 appraisal was pretextually low in order to accomplish the goal of extending Jain's probation.

81.    Emmanuel's concerns about Jain were also primarily about the outward expressions of Jain's disability (for example an apparent lack of energy), one of which was described by Jain's primary care provider. *See* ¶ 32.

82.    Thus, but-for Jain's disabilities, Emmanuel would not have been concerned about Jain's energy, fit, or other subjective concerns, and he would not have dismissed Mr. Jain.

83.    As a result of the County's conduct, Mr. Jain suffered monetary and non-monetary damages, such as lost wages and emotional distress.

---

## COUNT II
*Disability Discrimination: Harassment*

84.    Mr. Jain realleges each prior allegation in this Count II.

85.     Emmanuel subjected Mr. Jain to unwelcome conduct, to include comments about Jain's "lack of energy," "leadership presence," and "fit."

86.     Emmanuel also told Jain's subordinates that Jain would be leaving soon, before he had been fired.

87.     Emmanuel also blatantly manipulated County performance management software to ensure he could give Jain a performance rating he said, at the time, Jain did not "deserve."

88.     Each of these acts was because of Jain's disabilities

89.     In total, Emmanuel's treatment of Jain was sufficiently severe, in addition to being sufficiently pervasive, to alter the terms and conditions of Jain's employment.

90.     As a result, Jain suffered damages in the form of emotional distress.

91.     As a result of the County's conduct, Mr. Jain suffered monetary and non-monetary damages, such as lost wages and emotional distress.

---

## COUNT III
*Retaliation: the Firing*

92.     Mr. Jain realleges each prior allegation in this Count III.

93.     Jain engaged in protected activity when, among other instances of protected activity, he complained of disability discrimination on October 23, 2017 and when he filed a grievance on October 24, 2017.

94.     Emmanuel fired Jain on October 27, 2017.

95.     The time nexus alone permits an inference of retaliation.

96.     As a result of the County's conduct, Mr. Jain suffered monetary and non-monetary damages, such as lost wages and emotional distress.

## RELIEF DEMANDED

97.     Mr. Jain requests from the Court judgment in his favor on all counts.

98.     Mr. Jain requests from the Court any injunctive relief necessary to make him whole and to prevent recurrence of the discriminatory and retaliatory conduct.

99.     Mr. Jain requests from the Court monetary damages, lost wages and the value of his lost benefits, and compensatory damages for non-economic harms, in an amount to be determined by a jury at trial.

100.    Mr. Jain requests from the Court any other relief that the Court finds just and proper.

101.    Mr. Jain requests that the Court award him reasonable attorneys' fees and costs.

102.    Mr. Jain requests pre- and post-judgment interest, to the fullest extent permitted by law.

**MR. JAIN DEMANDS TRIAL BY JURY ON ALL ISSUES SO TRIABLE**

Dated: May 8, 2019

Respectfully Submitted,

/s/

Jacob Small (VSB # 84460)
Attorney for Dharmesh Jain
J. Madison PLC
9302 Lee Highway
Suite 1200
Fairfax Virginia 22031
P (703) 910-5062
F (703) 910-5107
jmsmall@jmadisonplc.com