IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

|  |  |  |
|---|---|---|
| DHARMESH JAIN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:19-cv-560 |
| | ) | |
| THE COUNTY BOARD OF ARLINGTON COUNTY, VIRGINIA, | ) ) ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

THIS MATTER comes before the Court on Defendant's Motion for Summary Judgment.

In December 2015, Defendant hired Plaintiff to serve as the department chief of the newly created Decision Support Division. Dr. Jain began his employment on a one-year probationary period with the possibility of becoming a permanent employee at the end of the one-year term. After a year of employment, Plaintiff's immediate supervisor, the Department Director of the Department of Environmental Services, decided to extend Plaintiff's probationary period. In October 2017, after an additional ten months on probation, Defendant terminated Plaintiff's employment with Arlington County. Plaintiff, who suffers from cardiac and neuro sarcoidosis, filed this lawsuit alleging that Defendant

discriminated against his disability by wrongfully terminating his employment (Count I) and subjecting him to a hostile work environment (Count II),[1] both in violation of the Americans with Disabilities Act. 42 U.S.C. § 12101 et seq..

Plaintiff began working as the Decision Support Chief on December 28, 2015. His work background as the former Director and Chief Information Officer of a department within the Grand Valley Metropolitan Council and his advanced degrees in engineering made him a natural hire for the new department. In this role, Plaintiff supervised eighteen to twenty people and was charged with crafting a vision for the new department. The new department sought to create opportunities for innovation in different units and develop decision support tools which would guide efficient decision-making.

With a few exceptions, all new employees for Arlington County begin their employment with a one-year probationary period. During this period, new employees are considered at-will employees and do not have complete access to the County's Grievance Procedures. Near the end of the probationary period, employees are evaluated against Key Work Expectations ("KWEs") which evaluate how well an employee met his supervisor's expectations. Depending on the score given to the employee, he

---

[1] Count III of Plaintiff's Complaint alleging Retaliation for Protected Activity was conceded by the Plaintiff and Summary Judgment will be granted on that count.

2

could be hired as a permanent employee, let go, or, as in Dr. Jain's case, his probationary period could be extended to provide more time to consider his performance.

In, or shortly after, August 2016, eight months into Plaintiff's probationary period, Plaintiff found a doctor to help treat his sarcoidosis. Because this would require Plaintiff to take time off work, Plaintiff disclosed the details of his condition to his immediate supervisor, Greg Emanuel. This included telling Mr. Emanuel that Plaintiff had a pacemaker implanted and that he suffered severe leg pain that caused him to walk slower in the afternoons. Immediately following this conversation, Plaintiff did not experience any changes in how Mr. Emanuel dealt with him. Jain Dep. 117:22-118:2.

Two months after this conversation, a 360 evaluation was conducted to assess Plaintiff's job performance as the new Department Chief. This evaluation considered feedback from peers, supervisors, and subordinates. The positive and negative responses were compiled into a report which went to Mr. Emanuel. Mr. Emanuel read the report and noted some negative comments which pointed to inadequacies in Plaintiff's communications skills and leadership ability. Seeking to solve this issue, Mr. Emanuel directed Plaintiff to create a communication plan which detailed how and when Plaintiff should interact with those he supervised.

3

Shortly after the 360 evaluation, Plaintiff gave a presentation on his vision for the Decision Support Division to others within the Department of Environmental Services. Mr. Emanuel attended the presentation and interjected at different points causing Plaintiff to feel that the flow of the presentation was disrupted. After the presentation, Mr. Emanuel received feedback from members of the Extended Leadership Team who were in attendance. Multiple people, including some of Plaintiff's staff, expressed that they were confused by the presentation and did not understand the vision that Plaintiff was presenting for the new department. Mr. Emanuel expressed concerns that the presentation lacked enthusiasm and that Plaintiff was not engaging the audience with the material.

A couple months after the presentation and near the end of Plaintiff's one-year probationary period, Mr. Emanuel conducted Plaintiff's annual performance appraisal. Arlington County's Guidebook for Performance Management provided the general guidelines for conducting these reviews. According to the Guidebook, supervisors ought to set KWEs for their employees and then assign a numerical score based on the employee's ability to meet the KWEs. The weights given to KWEs should total 100%. Any rating at 3.0 or above falls in the category of "Meets Expectations." Evaluators are not able to deny a pay increase or extend a probation period for anyone achieving this rating.

Mr. Emanuel did not follow the Guidebook when conducting Plaintiff's review. Mr. Emanuel did not set Dr. Jain's KWEs until the day of his performance evaluation, so Dr. Jain did not know the specifics of his KWEs until after his first year of work. Furthermore, Mr. Emanuel did not enter the KWE weights to total 100%. The weights on Plaintiff's evaluation totaled to 90% and Mr. Emanuel approved the appraisal even though the incorrect weights would not allow the evaluation to be electronically signed by the Plaintiff. Mr. Emanuel went through eighty-four revisions to Plaintiff's performance review; some iterations gave Plaintiff a 3.0 out of 5 while others resulted in a 2.9. During this process, Mr. Emanuel learned that he could not continue Plaintiff's probationary period if Plaintiff received a score of 3.0 or higher. After learning this information, Mr. Emanuel scored Plaintiff at a 2.9 and extended his probationary period for an additional six months. Plaintiff also received additional instructions on ways to improve his performance before the next evaluation. At this time, Plaintiff was still an at-will employee. Mr. Emanuel had no obligation to extend his probation period or to make him a permanent employee. Mr. Emanuel could have fired Plaintiff instead.

For the beginning of the new six-month probationary period, Plaintiff had to choose an executive coach to serve as his mentor. Plaintiff selected Chuck Appleby, a leadership and

5

organizational development practitioner. Defendant had hired Mr. Appleby as an executive coach in the past to help other employees improve as teambuilders and communicators. Defendant hoped Mr. Appleby would be successful helping Dr. Jain improve in these areas as well.

A couple months later, in April 2017, Plaintiff gave another presentation within the Department of Environmental Services. Mr. Emanuel attended this presentation and determined that he was not satisfied with Plaintiff's improvement. Shortly after this, Plaintiff was informed that he would not become a permanent employee with Defendant. Mr. Emanuel suggested that Plaintiff seek employment elsewhere because Plaintiff's presentation lacked energy and Plaintiff was not the correct fit for the Defendant's new department. Mr. Emanuel was concerned with Plaintiff's leadership presence, including his stammer and communication skills; Plaintiff's fit within the department; and, Plaintiff's lack of energy and enthusiasm during his presentations.

On June 22, 2017, Mr. Emanuel sat down with Plaintiff and Chuck Appleby to discuss Plaintiff's performance. Mr. Emanuel repeated his concerns about Plaintiff's performance and made it clear that Plaintiff would not become a permanent employee with Defendant, regardless of any additional improvements. Even though Plaintiff would never become a permanent employee, Mr.

Emanuel extended Plaintiff's probation until October 27, 2017. Mr. Emanuel hoped that Plaintiff would be able to use this additional probation time to find new employment. He also instructed Mr. Appleby, who was still being paid by Defendant, to begin helping Plaintiff with the job search.

After the meeting, Mr. Emanuel sent Plaintiff a memo stating that Plaintiff had completed many of his assigned tasks, but that he had failed to win over his team as their leader. Mr. Emanuel repeated many of his earlier criticisms and stated that Plaintiff's abilities would be better suited in a different job, either working for the Defendant in another capacity or with another employer. Plaintiff began applying for other jobs while still working for the Defendant and was even encouraged to continue his job search during work hours.

During this final probationary period, Mr. Emanuel asked Plaintiff to resign on several occasions, always citing that Plaintiff was the wrong fit for the job and that Plaintiff lacked leadership presence. Each time, Plaintiff disregarded the request and continued working.

On October 2, 2017, Mr. Emanuel informed Plaintiff's subordinates that Plaintiff would not be working for Defendant for much longer. This prompted Dr. Jain to reach out to the Disability Resource and ADA Coordinator for the first time. On October 24, 2017, Plaintiff filed an official complaint based on

7

Mr. Emanuel's negative comments about Plaintiff's energy, fit, and leadership presence. Three days later, on October 27, 2017, after almost ten additional months on probation, Mr. Emanuel terminated Plaintiff's employment with Defendant.

Under Federal Rule of Civil Procedure 56, a court should grant summary judgment if the pleadings and evidence show that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). In reviewing a motion for summary judgment, the court views the facts in the light most favorable to the non-moving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). Once a motion for summary judgment is properly made, the opposing party has the burden to show that a genuine dispute of material fact exists. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). Discovery has now closed, and, since there is no genuine dispute of material fact, this case is ripe for summary judgment.

Defendant argues that it is entitled to summary judgment on Plaintiff's wrongful termination claim (Count I) because Plaintiff did not perform his job at a level that met Defendant's expectations and the record does not support a reasonable inference of discrimination. Plaintiff contends that Mr. Emanuel's comments were targeting his disability and Mr. Emanuel's failure to follow

8

the County's Guidebook shows that Plaintiff met expectations and was fired because of his disability. Defendant also argues that it is entitled to summary judgment on Plaintiff's hostile work environment claim (Count II) because Plaintiff has not suffered any severe and pervasive harassment and the Defendant's conduct was neither subjectively nor objectively offensive. Plaintiff responds that Defendant's course of conduct created a hostile work environment when all the offensive and harassing actions are taken in the aggregate. Based on these arguments, the Court finds that the Defendant is entitled to summary judgment on all counts.

First, Defendant is entitled to summary judgment on Plaintiff's Americans with Disabilities Act claim for wrongful termination. When analyzing a wrongful termination claim, courts in the Fourth Circuit use the McDonnell Douglas burden-shifting framework. This test is appropriate when the defendant claims that it terminated the plaintiff for reasons unrelated to the plaintiff's disability. Under this test, a plaintiff must first "prove by a preponderance of the evidence that (1) he was a member of the protected class; (2) he was discharged; (3) at the time of the discharge, he was performing his job at a level that met his employer's legitimate expectations; and (4) his discharge occurred under circumstances that raise a reasonable inference of unlawful discrimination." Runnebaum v. NationsBank of Md., N.A., 123 F.3d 156, 164 (4th Cir. 1997); see also Ennis v. Nat'l Assn of Bus. &

Educ. Radio, Inc., 53 F.3d 55, 58 (4th Cir. 1995). If a plaintiff succeeds in making this showing, the burden shifts to the defendant to provide some legitimate, nondiscriminatory explanation of why the plaintiff was terminated. Id. If the defendant proves a legitimate reason for terminating the plaintiff, the burden shifts back to the plaintiff to prove that the given reason was pretextual. Id. In this case, the Defendant claims to have terminated Plaintiff for reasons related to his job performance, not his disability. For this reason, the Court proceeds under the McDonnell Douglas framework.

Defendant argues that it is entitled to summary judgment on Plaintiff's wrongful termination claim because Plaintiff cannot prove a prima facie case. Defendant claims that Plaintiff cannot prove two essential elements. First, that Plaintiff was meeting Defendant's legitimate performance expectations at the time of his discharge. Second, that his termination raises a reasonable inference of discrimination. Plaintiff responds by asserting that the decision to terminate him was based on his disability because the negative comments he received related to his disability and Defendant's dissatisfaction with his performance came only after Defendant learned of Plaintiff's disability.

Plaintiff has failed to produce sufficient evidence to show that he was meeting his employer's legitimate expectations. It is well-established that a court is not a "super-personnel department

10

weighing the prudence of employment decisions[.]" Anderson v. Westinghouse Savannah River Co., 406 F.3d 248, 272 (4th Cir. 2005) (quoting DeJarnette v. Corning, Inc., 133 F.3d 293, 299 (4th Cir. 1998)). For this reason, courts consider the "perception of the decision maker . . . not the self-assessment of the plaintiff." Warch v. Ohio Cas. Ins. Co., 435 F.3d 510, 518 (4th Cir. 2006) (quoting Hawkins v. PepsiCo, Inc., 203 F.3d 274, 280 (4th Cir. 2000)). Plaintiff was hired to be a leader for the Defendant's new department. After Plaintiff worked for the Defendant for ten months, Mr. Emanuel began to receive negative feedback concerning Plaintiff's performance. A 360 evaluation was done which contained negative feedback relating to Plaintiff's leadership abilities and his communication skills. No evidence has been produced to show that those responding to the survey knew of Plaintiff's disability or gave negative reviews because of his disability.

Beyond the 360 evaluation, Defendant received negative feedback following a presentation Plaintiff gave to members of his department. Members of the department conveyed various negative and positive comments to Mr. Emanuel concerning Plaintiff's communication and presentation abilities. Plaintiff has provided no evidence that these comments were made because of Plaintiff's disability. Additionally, nothing in the record suggests that those making the comments even knew of Plaintiff's disability.

Both the 360 evaluation and the presentation occurred in the Fall of 2016. Plaintiff does not contend that any comments about his lack of energy occurred until April 2017. Jain Dep. 117:22-118:2. By the end of Plaintiff's initial one-year probationary period, Mr. Emanuel had received several negative comments regarding Dr. Jain's job performance. This negative feedback came before any of the allegedly discriminatory comments were made and the feedback was provided by persons who did not have notice of Plaintiff's disability. If Mr. Emanuel had wished to fire Dr. Jain at this time, that was completely within his power, Plaintiff was an at-will employee. But, instead of firing Plaintiff, Mr. Emanuel extended his probation period.

Plaintiff next contends that Mr. Emanuel discriminated against him in the evaluation process because he failed to follow the Guidebook when conducting Plaintiff's performance evaluation. Plaintiff argues that Mr. Emanuel's improper manipulation of Plaintiff's evaluation rating shows that Plaintiff was meeting Defendant's expectations. However, Plaintiff has provided no evidence that the Guidebook creates binding rules. Nothing suggests that the Guidebook creates requirements that supervisors must follow when evaluating employees. Other employees of the County explained that the Guidebook serves merely as a resource for those in leadership positions. Mr. Emanuel failed to follow the Guidebook when evaluating Plaintiff, but this does not mean

12

that Plaintiff was automatically meeting Defendant's legitimate expectations.

Based on feedback from those working with Plaintiff who did not know about his disability, Mr. Emanuel had concrete reasons to be concerned with Plaintiff's leadership and his communication skills. Plaintiff did have successes in his role and believed that he was meeting all the goals that Defendant gave him. However, the inquiry is not whether Defendant had an accurate appraisal of Plaintiff's job performance, but whether Defendant reasonably believed that Plaintiff did not meet the legitimate expectations set for him. See King v. Rumsfeld, 328 F.3d 145, 149 (4th Cir. 2003). Here, based on the recorded deficiencies in Plaintiff's job performance by those who did not know of Plaintiff's disability, the Court finds that Plaintiff did not meet Defendant's legitimate expectations.

Even if Plaintiff did meet Defendant's expectations, the record does not leave any room for a reasonable inference of unlawful discrimination. Plaintiff argues that because of Mr. Emanuel's comments about Plaintiff's lack of energy and weak leadership presence, a jury could infer that Mr. Emanuel fired Plaintiff because of his disability. Mr. Emanuel knew of Plaintiff's disability prior to his performance evaluation in December 2016. Instead of firing Plaintiff at this time, Mr. Emanuel extended Plaintiff's probation period. It was not until

April 2017 that Mr. Emanuel began to make comments about Defendant's lack of energy and enthusiasm. In the instances where Plaintiff remembers Mr. Emanuel commenting on Plaintiff's lack of energy, the context shows that the comments were not in reference to Plaintiff's disability but were in reference to Plaintiff's skills as a presenter and perceived inability to command the attention of a room. Furthermore, based on Plaintiff's deposition, Plaintiff never even experienced lower energy levels, nor did he report such a condition to Mr. Emanuel. Jain Dep. 83:3-83:23.

Additionally, Mr. Emanuel received comments from other staff concerning Plaintiff's communication skills and leadership ability. Nothing in the record suggests that comments concerning Plaintiff's leadership ability and fit were references to his disability. The record instead supports that these comments were references to documented concerns with Plaintiff's work performance.

The record shows also that Defendant tried to help Plaintiff succeed in his role. Defendant kept Plaintiff on after his first year and hired an executive coach to help Plaintiff learn better teambuilding skills. The executive coach assisted Plaintiff with his communication skills and eventually helped Plaintiff with his job search. These actions cut against any inference that Defendant was trying to push Plaintiff out because of his disability.

14

Since Plaintiff cannot make out a prima facie case, the Defendant has no additional burden to prove nondiscriminatory reasons for Plaintiff's termination. Plaintiff has not provided evidence from which a jury could infer that statements concerning Plaintiff's energy, fit, and leadership were meant to discriminate against the Plaintiff.

Second, Defendant is entitled to summary judgment on Plaintiff's hostile work environment claim. To prevail on an ADA hostile work environment claim, a plaintiff must establish that: (1) he is a qualified individual with a disability; (2) he was subject to unwelcome harassment; (3) the harassment was based on his disability; (4) the harassment was sufficiently severe or pervasive to alter a term, condition, or privilege of employment; and (5) some factual basis exists for imputing liability to the employer. Fox v. GMC, 247 F.3d 169, 177 (4th Cir. 2001).

To establish that the allegedly harassing behavior was sufficiently severe and pervasive, a plaintiff must show that the conduct was both subjectively and objectively hostile. Fox, 247 F.3d at 178. To satisfy the objective component, the allegedly harassing conduct must be considered hostile to a "reasonable person." Id. Factors to be considered are the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work

15

performance." Id. The harassing conduct is considered severe and pervasive when "the workplace is permeated with discriminatory intimidation, ridicule, and insult." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993).

Plaintiff agrees that no individual comment meets the standard of being objectively hostile but claims that all of Defendant's conduct in the aggregate created a hostile work environment. This includes the comments about Plaintiff's energy, fit, and leadership skills, as well as all the requests that Plaintiff resign. The Court finds that this pattern does not show a hostile work environment, even when taken in the aggregate.

Setting aside whether Plaintiff was subjectively offended by Defendant's conduct, the Court finds that these comments and requests to resign were not objectively severe. Courts interpreting the objective severity component must consider whether the conduct is so severe that it "interferes with an employee's work performance." Fox, 247 F.3d at 178. The allegedly harassing behavior must also be more than just rude or unpleasant. See EEOC v. Sunbelt Rentals, Inc., 521 F.3d 306, 315-16 (4th Cir. 2008). Here, there is no evidence in the record that the allegedly harassing comments were physically threatening or affected Plaintiff's work performance. Part of Mr. Emanuel's job as Plaintiff's supervisor was to give feedback on Plaintiff's job performance and areas where Plaintiff could improve. Comments that

16

Plaintiff needs to improve his leadership presence, even if subjectively offensive, do not approach the line of objectively offensive comments. Furthermore, if repeated requests that an employee resign are sufficient to create a hostile work environment, then employers will have no choice but to terminate employees without the option of a resignation. In many instances, this will not serve the interests of either the employer or the employee.

Even after construing the evidence in a light most favorable to the non-moving party, the Court finds that the Defendant is entitled to summary judgment on Plaintiff's hostile work environment claim (Count II) because the allegedly harassing conduct is not sufficiently severe and pervasive. The Court will not address any other bases for summary judgment on Count II since Defendant is entitled to summary judgment based on the Plaintiff's failure to meet the fourth element of the claim.

For the forgoing reasons, this Court finds that Defendant is entitled to summary judgment on all counts. An appropriate order shall issue.

/s/ Claude M. Hilton
CLAUDE M. HILTON
UNITED STATES DISTRICT JUDGE

Alexandria, Virginia
September 28, 2020

17